### IN THE UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| SENECA ADAMS, TARI ADAMS, and SICARA ADAMS, ) ) ) Plaintiffs, ) ) v. ) ) CITY OF CHICAGO, CHICAGO POLICE ) OFFICERS MARGARET HOPKINS, Star #5545, ) TIMOTHY MCKEON, Star #7210, MATTHEW ) RILEY, Star #11197, JOHN DAHLBERG, Star ) #13708, JENNIFER O'SHAUGNESSY, Star ) #16499, KEITH HERRERA, Star #17289, JOHN ) HURLEY, Star #17516 and UNKNOWN ) CHICAGO POLICE OFFICERS, ) ) Defendants. ) | No. 06 C 4856<br><br>Judge Charles R. Norgle, Sr.<br><br>Magistrate Judge Brown<br><br><br><br><br><br><br><br><br><br>JURY TRIAL DEMANDED |

### FOURTH AMENDED COMPLAINT

NOW COME Plaintiffs SENECA ADAMS, TARI ADAMS, and SICARA ADAMS, through their attorneys, Smith, Johnson & Antholt, LLC, and complaining of Defendants, CITY OF CHICAGO, CHICAGO POLICE OFFICERS MARGARET HOPKINS, Star #5545, TIMOTHY MCKEON, Star #7210, MATTHEW RILEY, Star #11197, JOHN DAHLBERG, Star #13708, JENNIFER O'SHAUGNESSY, Star #16499, KEITH HERRERA, Star #17289, JOHN HURLEY, Star #17516, and UNKNOWN CHICAGO POLICE OFFICERS, as follows:

#### Introduction

1. This action, arising out of the violations of the U.S. Constitution and for transgressions of Illinois law caused by one or more of the Defendants, is brought pursuant to 42 U.S.C. Section 1983 to redress the deprivation under color of law of Plaintiffs' rights as secured by the United States Constitution.

**Jurisdiction and Venue**

2. This Court has jurisdiction of the action pursuant to 28 U.S.C. §§ 1331 and 1343(a), and venue is proper under 28 U.S.C. § 1391(b). All of the events giving rise to the claims asserted herein occurred within the District.

**Parties**

3. At the time of the events complained of the Plaintiffs were all residents of Chicago, Illinois.

4. Defendants Chicago Police Officers Margaret Hopkins, Star #5545, Timothy McKeon, Star #7210, Matthew Riley, Star #11197, John Dahlberg, Star #13708, Jennifer O'Shaugnessy, Star #16499, Keith Herrera, Star #17289, John Hurley, Star #17516, and Unknown Chicago Police Officers, collectively the "Defendant Officers," were, at the time of this occurrence, Chicago Police Officers. They engaged in the conduct complained under color of law. They are sued in their individual capacities.

5. Defendant City of Chicago, ("City") is a municipal corporation duly incorporated under the laws of the State of Illinois, and is the employer and principal of all other Defendants.

**Background**

6. On September 14, 2004, Seneca Adams was running home when he was approached by some of the Defendant Officers, including Riley, O'Shaughnessy, and Hopkins.

7. The Defendant Officers dashed toward Seneca Adams from behind with their pistols at the ready, pointing their service weapons at Seneca's person. In response, Seneca raised his hands.

8. Seneca complied with Officer Riley's orders to get down on the ground.

2

9. Despite the fact that Seneca complied with his orders, Officer Riley kicked Seneca in the face, striking his eye, prior to handcuffing him.

10. As he was taken into police custody some of the Defendant Officers berated Seneca with racially charged language, calling Seneca a "nigger."

11. Both outside of the police vehicle and in the car, Officer Riley struck Seneca causing bruises, cuts and swelling to his face.

12. At some point while Seneca was being taken into custody or shortly thereafter, Officers John Dahlberg, Timothy McKeon, Keith Herrera, John Hurley arrived at the scene.

13. Members of the community who witnessed Defendants' assault on Seneca became agitated. A crowd gathered, yelled at the officers and began to throw rocks and debris.

14. The Defendant Officers then entered their vehicles and left the scene.

15. At one point while in the police vehicle, Officer Riley asked Seneca words to the effect of "You gonna give me a gun?" When Seneca answered that he did not have a gun, Officer Riley responded with words to the effect of, "That's not what I want to hear."

16. In addition to the area of his arrest, the Defendant Officers drove to two separate locations prior to taking Seneca to the police station.

17. One of the locations was behind the Cook County jail in the area of 26th Street and Sacramento Avenue.

18. In the area of 26th Street and Sacramento Avenue, Defendant Officers Riley, Dahlberg, McKeon, Herrera, Hurley, O'Shaughnessy and Hopkins met.

19. While the Defendant Officers were conferring, Seneca's brother and sister, Plaintiffs Tari and Sicara Adams, approached in their car.

3

20. Tari and Sicara pulled up to the Defendant Officers and asked about their brother.

21. Officer Herrera reached through the driver's side open window and punched Tari in the face.

22. Tari and Sicara immediately left. When their car was stopped at a red light, the Defendant Officers approached in their vehicles.

23. Without warning, Officers O'Shaugnessy and Hopkins struck the driver's side of the Adams' car with their police vehicle.

24. Determined to get back to their home where witnesses were gathered, Tari continued to drive to the area of 26th Street and California Boulevard.

25. Upon their arrival, Sicara ran from the vehicle into the crowd.

26. Tari was tackled shortly after exiting the car. One of the officers placed his knee on the back of Tari's neck and struck him several times on the back of the head.

27. Tari was struck several more times while inside of the police vehicle.

28. All three Plaintiffs, Seneca, Tari and Sicara were arrested and criminally charged.

29. The Defendant Officers put false information into the police reports regarding the events leading to and during the Plaintiffs' arrests. These false statements caused all Plaintiffs to be charged and prosecuted and Seneca and Tari to be incarcerated.

30. On October 19, 2004, the charges against Sicara Adams were dismissed in a manner indicative of Sicara's innocence.

31. Seneca Adams was charged with felony counts of aggravated battery to a police officer and unlawful use of a weapon.

4

32. Tari Adams was charged with felony counts of aggravated battery to a police officer and aggravated assault of an officer.

33. At the criminal trial in the Circuit Court of Cook County, Defendant Officers Hopkins, Herrera and Riley gave false testimony regarding the events of September 14, 2004.

34. Further, none of the Defendant Officers disclosed to the prosecution or the defense that they and their teammates had and continued to engage in a pattern of similar misconduct in their capacities as Chicago police officers assigned to the Special Operations Section.

35. On May 18, 2006, Tari and Seneca were both found not guilty of all felony charges. They were, however, found guilty of misdemeanor charges.

36. On December 19, 2006, after the impeachment evidence that the Defendant Officers had been engaged in a pattern of similar misconduct was publicly revealed, the misdemeanor convictions resulting from this incident were vacated.

### The Pattern of Misconduct

37. Defendant Officers Hopkins, McKeon, Riley, Dahlberg, O'Shaugnessy, Herrera, and Hurley worked together as part of the Special Operations Section ("SOS") of the Chicago Police Department.

38. For years prior to the events here, SOS officers were given free range by the Department to violate the law in order to bring in high numbers or arrests, guns, and drugs.

39. The SOS's Standing Operating Procedure stated that officers who did not have high enough productivity (bringing in arrests, guns, etc.) would be removed from the unit.

40. The SOS officers frequently abused citizens and the criminal court processes by, among other things, using excessive force, making false arrests and police reports, stealing, fabricating and/or withholding evidence, and illegally searching homes and property.

41. The SOS unit employed the practices enumerated above openly and with impunity, and were encouraged to do so by their supervisors.

42. On approximately June 25, 1999, the Commanding Officer of the Special Operations Section issued a memorandum instructing that if SOS officers were questioned by Department inspectors about their compliance with Departmental policies, they should practice their stories together prior to giving a statement. The memorandum goes on to state that he would "back" the officers whether they were right or wrong. That memorandum became a part of the unit's Standard Operating Procedures Packet.

43. Going back to at least 2002, the Chicago Police Department amassed hundreds of complaints related to the above practices by the Special Operations Section officers, but routinely "not-sustained" or "unfounded" them without any thorough investigation.

44. Members of the SOS unit themselves were frequently assigned to be the "investigators" of the complaints of misconduct by the SOS officers.

45. After years without any action by the Department, in approximately 2006, the Cook County State's Attorney's Office noticed the pattern in the criminal cases brought by the SOS officers.

46. In late 2006 and 2007, unlike the Chicago Police Department, the State's Attorney's Office finally took action. It investigated and criminally indicted SOS officers

including Defendant Officers Herrera and Hopkins for a pattern of misconduct committed in the capacities as Chicago police officers.

47. Defendant Officers Herrera and Hopkins, as well as several other of the Defendant Officers' former teammates, have since pleaded guilty to the criminal charges against them stemming from their conduct as SOS officers.

## The City's Deliberate Indifference

48. The City of Chicago maintains a de facto policy, practice and custom of failing to properly train, supervise, discipline and control its officers, which was the moving force behind the violations of the Plaintiffs' constitutional rights.

49. The Chicago Police Department was long aware of a pattern of criminal misconduct within the Special Operations Section and yet it failed to take action to remove those corrupt police officers from Chicago's streets.

50. Instead of taking action to discipline the easily identifiable group of corrupt officers, the City left the control of those officers to a disciplinary system that it's policymakers had long recognized as broken and ineffective in responding to patterns of misconduct.

51. The City Council is the final policymaker for the Chicago Police Department. Within the City Council, the Committee on Police and Fire has jurisdiction over all matters relating to the Police Department.

52. The Superintendent to the Police is the chief executive officer of the police department. By authority delegated to him by municipal ordinance, he has the authority to issue department directives, to issue instructions to the CPD's employees, and to take disciplinary action against the employees.

7

53.     Municipal policy-makers have long been aware of the City's policy and practice of failing to properly train, monitor and discipline its police officers who engage in misconduct.

54.     In 1999, following two high profile incidents of excessive force, the City Council held public hearings on the prevalence of excessive force, as well as the failure of the Department's disciplinary system. At those hearings, members of the Council assured the public that changes would be made to the Chicago Police Department policies and practices to address these issues.

55.     On September 28, 1999, the then-Superintendent of police gave a speech highlighting problems with the City of Chicago's policies and practices relating to the use of force. Superintendent Hillard spoke specifically of the need for (1) better in-service training on the use of force; (2) early detection of potential problem officers; (3) an effective disciplinary system, and (4) officer accountability for the use of force.

56.     In January 2000, the Chairman of the Committee on Police and Fire of the Chicago City Council submitted an official resolution recognizing that "[Chicago] police officers who do not carry out their responsibilities in a professional manner have ample reason to believe that they will not be held accountable, even in instances of egregious misconduct."

57.     A study performed a year later by the Justice Coalition of Greater Chicago ("JCGC"), a coalition of more than a hundred community groups, confirmed that resolution. Specifically, the JCGC study concluded that the Chicago Police Department lacked many of the basic tools necessary to identify, monitor, punish and prevent police misconduct and brutality. The JCGC findings were presented to Mayor Daley, Superintendent Hillard and the Chicago Police Board.

8

58. Two years later, a federal jury in the case of *Garcia v. City of Chicago*, No. 01 C 8945, 2003 WL 22175618, at *2 (N.D. Ill. Sept. 19, 2003) affirmed that the City's police misconduct investigations were systematically "incomplete, inconsistent, delayed, and slanted in favor of the officers" and as a result, fostered a culture of impunity within the Chicago Police Department. The "City of Chicago's custom and practice of not adequately investigating, disciplining, or prosecuting off duty Chicago police officers who use excessive force against individuals" was found to have directly caused the constitutional harm. *Id.* at *1.

59. Phillip Cline, the Superintendent of the City of Chicago's Police Department at the time of the events complained of herein, was aware of a pattern of alleged misconduct within the Special Operations Section, including by the Defendant Officers, but took no action to remove the Defendant Officers from street duty. Further, Cline failed to alert prosecutors and/or the plaintiff or plaintiffs' criminal defense attorneys of a pattern of misconduct by the Defendant Officers before or during the criminal proceedings against Plaintiffs.

60. In 2007, the City held a press conference in which then-Superintendent Cline and head of Internal Affairs, Debra Kirby, publicly acknowledged the pattern of SOS misconduct and that the Department had been aware of the problem since 2003.

61. In the summer of 2008, Police Superintendent Weiss gave the following statement on the nationally broadcast television program 60 Minutes:

> "I think there probably was an atmosphere that, 'Hey, we're above the law. We're getting great stats. We're pulling guns off the street, we're taking down drug dealers. Yeah, maybe we are breaking the rules, maybe we are breaking the laws, but look what we've accomplished.' They lost their way, and it saddens me because supervisors have a lot of power, and if they're encouraging their people to engage in misconduct, or actually in some instances, to even engage in criminal activity, that is horrific, in my eyes."

9

62. Although the City of Chicago had long been aware that its supervision and discipline of police officers was entirely inadequate, as of May 18, 2006 it had not enacted any measures to address that failure. Redress that was specifically promised by the City Council and the Superintendent went unfilled.

63. For example, the City failed to institute any system for recognizing problem officers or to ensure an effective disciplinary system.

64. At the time of the events at issue in this case, the Department had not implemented any written policy, practice or procedure to conduct pattern analysis of complaints of misconduct against Chicago police officers. Thus, officers such as those in the Special Operations Sections were able to accumulate large numbers of complaints of similar misconduct without fear of disciplinary action.

65. At the time of the events at issue in this case, the City's Police Board did not have in place a protocol whereby its members received notice of a pattern of, or number of, complaints, lawsuits, and/or settlements against officers for whom discipline was recommended.

66. At the time of the events at issue in this case, the City's Police Superintendent did not have in place a protocol whereby he received notice of a pattern of, or number of, complaints, lawsuits, and/or settlements against officers for whom discipline was recommended.

67. As a result of the City's policies, practices and customs, its officers were emboldened by their knowledge that they were "above the law" and would not be held accountable for their misconduct.

68. At the time of Plaintiffs' arrest and criminal prosecutions, the Defendant Officers knew that the City would not subject them to any meaningful investigation and discipline. Their

10

misconduct in this case was a direct result of the City's failure to adequately discipline and control its officers.

## Count I
## 42 U.S.C. Section 1983 — Excessive Force

69. Each of the foregoing paragraphs is incorporated as if restated fully herein.

70. The actions of the Defendant Officers, under color of law, constituted unreasonable, unjustifiable, and excessive force against Plaintiffs, thus violating Plaintiffs' rights under the Fourth Amendment to the United States Constitution.

71. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally with willful indifference to Plaintiffs' constitutional rights.

72. As a proximate result of the above-detailed actions of Defendants, Plaintiffs were injured, including physical injuries and emotional distress.

## Count II
## 42 U.S.C. Section 1983 — False Arrest

73. Each of the foregoing paragraphs is incorporated as if restated fully herein.

74. The Defendant Officers' arrests of Plaintiffs, while acting under color of law, were without probable cause in violation of Plaintiffs' right to be free of unreasonable seizures under the Fourth Amendment of the United States Constitution.

75. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally with willful indifference to Plaintiffs' constitutional rights.

76. As a proximate result of the above-detailed actions of Defendants, Plaintiffs suffered injuries including emotional distress and a deprivation of their liberty.

## Count III
## 42 U.S.C. Section 1983 — Unlawful Seizure

77.	Each of the foregoing paragraphs is incorporated as if restated fully herein.

78.	The Defendant Officers, acting under color of law, caused the seizure of Plaintiff Sicara Adams' vehicle in violation of Plaintiff's right to be free of unreasonable seizures under the Fourth Amendment of the United States Constitution and without procedural due process as required by the Fourteenth Amendment.

79.	The misconduct described in this Count was objectively unreasonable and was undertaken intentionally with willful indifference to Plaintiff's constitutional rights.

80.	As a proximate result of the above-detailed actions of Defendants, Plaintiff was injured, including the deprivation her property.

## Count IV
## 42 U.S.C. Section 1983 – Due Process

81.	Each of the foregoing paragraphs is incorporated as if restated fully herein.

82.	As described more fully above, all of the Defendants, acting under color of law, deprived Plaintiffs Seneca Adams and Tari Adams of their constitutional right to a fair trial under the Fourteenth Amendment of the United States Constitution

83.	In the manner described more fully above, the Defendants deliberately withheld material impeachment evidence that would have shown that the officers responsible for their arrests and prosecutions were engaged in a widespread pattern of similar misconduct.

84.	The misconduct described in this Count was objectively unreasonable and was undertaken intentionally with willful indifference to Plaintiffs' constitutional rights.

85. As a result of this violation of his constitutional rights, Plaintiffs suffered injuries, including, but not limited to, emotional distress and a deprivation of their liberty.

### Count V
### 42 U.S.C. Section 1983 – Equal Protection

86. Each of the foregoing paragraphs is incorporated as if restated fully herein.

87. As described more fully above, Defendants denied Plaintiffs equal protection of the law in violation of their constitutional rights.

88. The actions of the Defendant Officers in falsely arresting Plaintiffs and subjecting them to unfair and unjustified criminal prosecutions were the result of purposeful discrimination against Plaintiffs because of their race.

89. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally with willful indifference to Plaintiffs' constitutional rights.

90. As a result of this violation, Plaintiffs suffered injuries, including but not limited to emotional distress and a deprivation of their liberty, as is more fully alleged above.

### Count VI
### 42 U.S.C. Section 1983 – Failure to Intervene

91. Each of the foregoing paragraphs is incorporated as if restated fully herein.

92. During the constitutional violations described above, one or more of the Defendant Officers stood by without intervening to prevent the misconduct. These officers had a reasonable opportunity to prevent the harm had they been so inclined, but failed to do so.

93. The misconduct described in this Count was undertaken with malice, willfulness, and reckless indifference to the rights of Plaintiffs and others.

13

94. As a result of the Defendant Officers' failure to intervene to prevent the violation of Plaintiffs' constitutional rights, Plaintiffs suffered pain and injury, as well as emotional distress, and a deprivation of their liberty.

## Count VII
### 42 U.S.C. Section 1983 – Conspiracy to Deprive Constitutional Rights

95. Each of the foregoing paragraphs is incorporated as if restated fully herein.

96. As described more fully above, the Defendants reached an agreement to falsely arrest and frame Plaintiffs for crimes that they did not commit, and to thereby deprive Plaintiffs of their Constitutional rights, all as described more fully throughout this Complaint.

97. Each of the Defendant Officers further conspired to deprive Plaintiffs of exculpatory evidence to which they were lawfully entitled and which would have led to a more timely exoneration of the false charges, as described more fully throughout this Complaint.

98. In furtherance of the conspiracy, each of the co-conspirators committed overt acts and was an otherwise willful participant in joint activity.

99. The misconduct described in this Count was undertaken with malice, willfulness, and reckless indifference to the rights of Plaintiffs.

100. As a result of the Defendants' conduct, Plaintiffs suffered pain and injury, as well as emotional distress, and a deprivation of their liberty.

## Count VIII
### *Monell* Claim Against Defendant City of Chicago

101. Each of the foregoing paragraphs is incorporated as if restated fully herein.

102. The Constitutional violations set forth in Counts I through VII were caused by the deliberate indifference of the City of Chicago ("City") such that the City itself is liable for the violations of Plaintiffs' Constitutional rights.

103. The conduct of the Defendant Officers in violating the Plaintiffs' Constitutional rights was undertaken pursuant to the policy and widespread practices of the Chicago Police Department in that:

    a. As a matter of both policy and practice, the Chicago Police Department directly encourages, and is thereby the moving force behind, the very type of misconduct at issue here by failing to adequately discipline, supervise and control its officers, such that its failure to do so manifests deliberate indifference;

    b. As a matter of both policy and practice, the City facilitates the very type of misconduct at issue here by failing to adequately punish and discipline prior instances of similar misconduct, thereby leading its officers to believe their actions will never be scrutinized and, in that way, directly encouraging future abuses such as those affecting Plaintiffs; specifically, Chicago police officers accused of misconduct can be confident that the Department will not investigate those accusations in earnest, and will refuse to discipline even where the officer has engaged in misconduct;

    c. The City maintained broken and deficient systems for supervising and disciplining its officers;

15

      d.    The City ignored the recognized and important need to track, discipline and control officers who repeatedly engaged in misconduct;

      e.    The City had the ability to identify and track officers like the Defendant Officers here that repeatedly engaged in misconduct, but chose not to identify, track and control the identifiable repeat abusers;

      f.    Generally, as a matter of widespread practice so prevalent as to comprise municipal policy, Chicago police officers abused citizens in a manner similar to that alleged by Plaintiffs in this Count on a frequent basis, yet the Chicago Police Department made findings of wrongdoing in a disproportionately small number of cases; and

      g.    Municipal policy-makers are aware of, and condone and facilitate by their inaction, a "code of silence" in the Chicago Police Department, by which officers fail to report misconduct committed by other officers, such as the misconduct at issue in this case.

104.    Defendant City maintained these policies and widespread practices in deliberate indifference to the foreseeable consequences including the violations of Plaintiffs' rights.

105.    Defendant City's deliberate indifference to these policies and widespread practices was the moving force behind the violations of Plaintiffs' constitutional rights.

106.    As a result of Defendant City's conduct in causing the constitutional violations, Plaintiffs suffered pain and injury, as well as emotional distress, and deprivation of their liberty.

### Count IX
### 745 ILCS 10/9-101 – Indemnification

107.    Each of the foregoing paragraphs is incorporated as if restated fully herein.

108.    Defendant City of Chicago is the employer of all police officer Defendants.

109. The Defendant Officers committed the acts alleged above under color of law and in the scope of their employment as employees of the City of Chicago.

## Count X
## Malicious Prosecution

110. Each of the foregoing paragraphs is incorporated as if restated fully herein.

111. The Defendant Officers caused the criminal proceedings against Plaintiffs Tari and Seneca Adams to be commenced and/or continued s on false charges for which they knew there was no probable cause.

112. The Defendant Officers acted with malice.

113. The criminal proceedings were terminated in Plaintiffs' favor.

114. The City is sued in this Count pursuant to the doctrine of *respondeat superior*, in that the Defendant Officers performed the actions complained of while on duty and in the employ of Defendant City, and while acting within the scope of this employment.

115. As a direct and proximate result of the malicious prosecution, Plaintiffs suffered injuries including emotional distress.

## Count XI
## Intentional Infliction of Emotional Distress

116. Each of the foregoing paragraphs is incorporated as if restated fully herein.

117. The above-detailed conduct by the Defendant Officers was extreme and outrageous.

118. Defendant Officers performed the acts detailed above with the intent of inflicting severe emotional distress on Plaintiffs with knowledge of the high probability that the conduct would cause such distress.

119. As a direct and proximate result of this conduct, Plaintiffs did in fact suffer severe emotional distress.

120. The City is sued in this Count pursuant to the doctrine of respondeat superior, in that Defendant Officers performed the actions complained of while on duty and in the employ of Defendant City, and while acting within the scope of this employment.

WHEREFORE, pursuant to 42 U.S.C. Section 1983, Plaintiffs demand judgment against the Defendants, jointly and severally, for compensatory damages and, because the Defendant Officers acted maliciously, wantonly, or oppressively, Plaintiffs seeks punitive damages against the Defendant Officers in the individual capacities, plus the costs of this action and attorney's fees, and such other and additional relief as this court deems equitable and just.

RESPECTFULLY SUBMITTED,

SENECA, TARI, AND SICARA ADAMS

   /s/ Amanda Antholt
By: one of their attorneys

PLAINTIFFS DEMAND TRIAL BY JURY.

Christopher Smith
Amanda Antholt
Robert Johnson
James Baranyk
Smith, Johnson & Antholt, LLC
112 S. Sangamon Street, 3rd Floor
Chicago, IL 60607
(312) 432-0400