

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| SENECA ADAMS, et al., )<br>)<br>Plaintiffs, )<br>)<br>v. )<br>)<br>CITY OF CHICAGO, )<br>)<br>Defendant. ) | No. 06 CV 4856<br><br>Hon. Charles R. Norgle |

## OPINION AND ORDER

Before the Court is Defendant City of Chicago's (the "City") motion for remittitur, or, in the alternative, for a new trial on damages. For the following reasons, the motion is granted as to Plaintiff Sicara Adams ("Sicara"). Her damages are remitted from $300,000 to $125,000. The motion, as it pertains to Plaintiffs Seneca Adams ("Seneca") and Tari Adams ("Tari") (collectively, "Plaintiffs"), remains under advisement.

## I. BACKGROUND

### A. Facts

Now thirty-years-old, Sicara is employed as a security guard after taking college criminal justice courses. She was twenty when these events occurred. As relevant here, on September 14, 2004, twenty-year-old twins Seneca and Sicara shared an apartment with their eighteen-year-old brother, Tari, and Sicara's four-year-old daughter, Ciara, in a neighborhood where they had lived their entire lives. Their mother lived a short distance away. At the time, Sicara was four months pregnant with her second daughter, Tyler. Sicara's boyfriend lived with them periodically.

At about 8:00 p.m. on September 14, 2004, hearing commotion outside, Tari and Sicara, who were inside the apartment at the time, decided to go outside to see what was happening.

Tari left through the back door. Sicara left through the front door. Once outside, she saw Seneca in a police car being beaten by one of the Defendant Officers.[1] Many spectators were present. Shortly thereafter, the police cars drove away from the scene with Seneca in custody. Sicara testified that she was worried because it did not look like the officers were driving in the direction of the police station. Sicara and Tari then called their aunt and their mother to let them know what was happening. After locking the apartment and checking on Ciara, Sicara and Tari got into Sicara's car and Tari drove in the direction that the officers had gone in an attempt to find Seneca. Sicara sat in the passenger seat.

Tari drove towards 26th and Sacramento, where they came upon a number of police cars and officers huddled outside of their cars. Sicara testified that she saw Seneca in the back of one of the police cars, crying with a swollen and bloody face. She then rolled down her window and yelled to the officers, asking them what they were doing with Seneca. After that, "a police officer came around to the driver's side and punched Tari in the face and tried to grab the gears of the car." Tr. of Pl. Sicara Adams's Testimony at 15, ¶¶ 5-7 (N.D. Ill. Feb. 19, 2014) [hereinafter Sicara Tr.]. Sicara testified that they feared for their lives so Tari drove away and headed back towards their apartment building. Tari stopped for a red light while waiting to turn left. They were "jerked" and felt a "big bang" and saw that a police car had hit the driver's side of their car. Id. at 17, ¶¶ 3, 7. Sicara testified that this made a "hole" in her car. Id. at 18, ¶ 1. Neither Sicara, nor her unborn child, suffered any physical injuries from this collision. Tari then drove off towards their community. Once the vehicle came to a stop on 25th Place, Sicara said that they were hit again from the back by a police car. The City disputes that that the car was

---

[1] The Defendant Officers include former and current Chicago Police Officers Margaret Hopkins, Timothy McKeon, Matthew Riley, John Dahlberg, Jennifer O'Shaugnessy, Keith Herrera, John Hurley, and unknown Chicago Police Officers, who were members of the now-disbanded Special Operations Section ("SOS") of the Chicago Police Department. The Defendant Officers were dismissed from this lawsuit before the case proceeded to trial on the issue of compensatory damages.

2

ever hit in the back, and admits only that the car was struck at the driver's side door. Notwithstanding this dispute, no injuries were sustained from any collision.

Sicara and Tari then exited the car. Eventually, Sicara was escorted to a police car, but she was never placed in handcuffs. Along the way, she watched as Tari was punched and kicked by officers. The officers transported Sicara to the police station located at 21st and Damen. She was then placed in a room with a bench and a couple of desks. She said that she was scared at the time—for herself, for her daughter Ciara, and for her unborn child, whom she feared she may have to give birth to in jail. She was four months pregnant. Sicara was also worried because, at the time, she did not know what was happening to her brothers. Sicara just sat there. Hours later, Seneca was brought into the room with Sicara. Sicara said that his face looked unrecognizable—Seneca's face and lips were swollen, he had cuts and bruises, and had received nine stiches. An hour or two later, Tari was brought into the room with Sicara and Seneca. Sicara said that his face looked hurt and that he was wearing a hospital gown with some blood on it.

The next morning, Sicara was transported to a different police station, located at Harrison and Kedzie where she was placed in a cell. This time, Sicara was fingerprinted, photographed, and processed, which she found degrading. She did not know what charges were being brought against her. Sicara testified that she did not receive any food or water, but she did not say whether she had asked for any. She said that she felt sick because "when you're pregnant, it's—it's hard. You're hungry all the time and you're sick." Sicara Tr. at 24, ¶¶ 18-20. Sicara testified that she was uncomfortable from the "steel, hard, cold bench" and that she "couldn't eat." Id. at 24, ¶¶ 21-22. Sicara was once again asked if she was given food or water at the station and she testified that "[a]fter hours of complaining my mother came to visit me, and I let

3

her know how hungry I was, how weak I was from not eating, and she complained, and eventually, hours after that, they eventually gave me water and a sandwich to eat." Id. at 25, ¶¶ 1-4. Sicara was released in the early morning hours on September 16, 2004. In total, Sicara spent slightly over twenty-four hours in the room and in jail. She was released on her own recognizance (no cash bond).

On the morning that Sicara was released from jail, she and her mother watched Seneca and Tari's bond hearing. Seneca and Tari appeared through a video monitor. Sicara said that she felt helpless looking at her brothers, and she watched as her mother cried and collapsed to the floor. Following the hearing, Seneca and Tari were transported to the Cook County Jail, where they remained in custody for 204, and 46 days, respectively.

Later that day, a friend drove Sicara back to her apartment where her boyfriend—who lived there periodically—was waiting for her. Sicara testified that she went to sleep for a couple of hours, but when she awoke she did not feel safe in the apartment anymore, so she gathered some of her belongings and moved in with her mother. Over time, she moved the rest of her things to her mother's apartment. Her mother lived in a one-bedroom apartment. Sicara and Ciara slept on an air mattress in the living room. During this time, both Sicara and Ciara suffered from nightmares, which did not stop until her brothers were released from jail, and sometimes she still has nightmares about the events that occurred the evening of September 14, 2004.

After she was released from custody, Sicara returned immediately to her job at Nordstrom's, where she worked as a sale's associate and cashier. She said that she did this to keep herself busy and to save bond money for Seneca and Tari. At the time of her release, Sicara said that she still did not know the charges against her, but she did receive a summons. She was

charged with disorderly conduct, a misdemeanor. Sicara complied with the summons and appeared in a courtroom in the back of a police station on the appropriate date. Sicara testified that when she went to court, she signed her I-bond, and when her case was called, she walked up to the judge, and her case was immediately dismissed. She could not recall whether an attorney had represented her in the matter. Nothing indicates that she hired one.

Sicara also attended the court dates set for her brothers' criminal cases. She said that on each court appearance she hoped that the charges against them would be dismissed as hers had been. Once Tari and Seneca were bonded out and released from the Cook County Jail, they were placed on house arrest for a period of time. In December of 2006, the charges against Seneca and Tari were dropped and their records were expunged. Sicara testified that, at some point, both Seneca and Tari left Chicago and moved to Arizona, where they currently reside.

Sicara testified how the events of September 14, 2004 changed her. She said that she became more protective of her daughters and that Ciara often asked where her uncles were. At one point, Sicara took Ciara, her four-year-old child, to the jail to visit Seneca and Tari because she thought that it would help Ciara with her nightmares, and she wanted to provide emotional support to her brothers. Sicara also said that the incident destroyed her faith in the police department. Whenever she thought about her old neighborhood where this occurred it reminded her of how her family was broken and how her freedom had been questioned. See Sicara Tr. at 38, ¶¶ 15-16. Sicara stated, "I'll never forget feeling like we were less of a people because we weren't judged off our actions, we was judged off where we lived and the color of our skin. It was horrible." Id. at 38, ¶¶ 17-20. Sicara went on to explain how the events changed her brothers' personalities and how it caused them to move away to another state. She said that they used to be very close when they lived together and Seneca and Tari would often take care of

Ciara when she worked evenings. However, Sicara said that their family unit was broken when Seneca and Tari moved to Arizona. Sicara also moved to Arizona briefly in February of 2006, two years after her arrest, but she returned to Chicago four months later. Sicara has never sought medical attention, counseling, or psychiatric or psychological treatment in relation to these events.

**B. Procedural History**

Plaintiffs initiated this action in the year 2006. Discovery was stayed for over two years while criminal proceedings and other investigations were conducted as to the Defendant Officers. The stay was lifted on June 1, 2009 and discovery went forth. Ultimately, after years of discovery, the parties reached an agreement wherein the City agreed to admit liability and proceed to a trial on the issue of compensatory damages only, in exchange for the dismissal of the individual Defendant Officers. Specifically, the City admitted to the following: (1) false arrest, in violation of the Fourth Amendment as to all Plaintiffs; (2) excessive force, in violation of the Fourth Amendment as to all Plaintiffs; (3) discrimination on the basis of race, in violation of the Equal Protection Clause of the Fourteenth Amendment as to all Plaintiffs; and (4) malicious prosecution, in violation of Illinois state law as to Seneca and Tari.

This case proceeded to a jury trial on compensatory damages against the City on February 18, 2014. On February 20, 2014, the jury found the following compensatory damages: (1) $2,400,000 for Seneca; (2) $1,000,000 for Tari; and (3) $300,000 for Sicara. The City timely filed the instant motion for a remittitur of the jury's verdict, which is fully briefed and before the Court. At this time, the Court addresses the motion only as it pertains to Sicara.

## II. DISCUSSION

### A. Standard of Decision

A jury's determination of compensatory damages must be accorded substantial deference. Ramsey v. Am. Air Filter Co., 772 F.2d 1303, 1313 (7th Cir. 1985) (internal citations omitted). "'Underlying this deference to a jury's assessment of damages is the acknowledgement that the actual measure of damages is an exercise of factfinding.'" Spina v. Forest Pres. Dist. of Cook Cnty., 207 F. Supp. 2d 764, 771 (N.D. Ill. 2002) (quoting Cygnar v. City of Chi., 865 F.2d 827, 847 (7th Cir. 1989)). However, "the court must also ensure that the award is supported by competent evidence." Ramsey, 772 F.2d at 1313. "When assessing the propriety of a compensatory damages award" upon a motion for remittitur or for a new trial, courts consider "whether the award is monstrously excessive, whether there is no rational connection between the award and the evidence, and whether the award is roughly comparable to awards made in similar cases." Lampley v. Onyx Acceptance Corp., 340 F.3d 478, 483-484 (7th Cir. 2003) (internal quotation marks and citation omitted); see also Dresser Indus., Inc., Waukesha Engine Div. v. Gradall Co., 965 F.2d 1442, 1446 (7th Cir. 1992) ("In this circuit, we will alter jury awards only if they are monstrously excessive, born of passion and prejudice, or not rationally connected to the evidence." (internal quotation marks and citation omitted)).

### B. Remittitur as to Sicara Adams

The City argues that the damages award as to Sicara was excessive and unsupported by the evidence. According to the City, the $300,000 award must have been based on passion and sympathy as opposed to actual evidence of harm because the evidence showed that Sicara suffered no physical injuries, she never sought any medical or mental health treatment and testified only in general terms as to her fear and sadness, she suffered no lost wages or damage to

future employment, the charges against her were immediately dismissed, and she spent just over twenty-four hours in jail.

A successful § 1983 plaintiff may not be awarded damages merely "to account for 'the abstract value of a constitutional right.'" Horina v. City of Granite City, 538 F.3d 624, 637 (7th Cir. 2008) (quoting City of Watseka v. Ill. Pub. Action Council, 796 F.2d 1547, 1559 (7th Cir. 1986)). A plaintiff must "prove that the denial of [her] constitutional rights resulted in an actual injury." Id. "'Rights, constitutional and otherwise, do not exist in a vacuum. Their purpose is to protect persons from injuries to particular interests . . . .' Where no injury [is] present, no 'compensatory' damages [can] be awarded." Memphis Cmty. Sch. Dist. v. Stachura, 477 U.S. 299, 308 (1986) (quoting Carey v. Piphus, 435 U.S. 247, 254 (1978)). "The fact that the 'monetary value of the particular injury is difficult to ascertain'—as is often the case when the injuries asserted are humiliation, distress, and other harms associated with the denial of a right—does not preclude an award of damages." Horina, 538 F.3d at 637 (quoting City of Watseka, 796 F.2d at 1558-1559). "But the plaintiff must nevertheless show that [s]he actually suffered those injuries . . . ." Id.

While it is undisputed that Sicara's constitutional rights were violated, she can only recover compensatory damages for actual injuries that resulted from those violations, not merely to compensate for the violation itself. See id. The evidence of actual injury to Sicara included generalized emotional harm that she suffered as a result of her arrest and twenty-four-hour detention. Sicara testified that she was nervous and scared when she was taken to the police station, and, because she did not know how long she would remain in custody, she feared giving birth to her child while in jail. See Sicara Tr. at 21, ¶¶ 3-13. While in custody, Sicara said that she felt sick and uncomfortable while in the cell due to her pregnancy and that she couldn't eat.

Id. at 24, ¶¶ 18-24. Although she mentioned more than once that she was not given food or water initially, she never specifically said whether she had asked for any. However, once Sicara's mother came to see her and asked for food for her daughter, Sicara was given a sandwich and some water. As further evidence of emotional injury, Sicara testified that she feared for her safety too much to remain living in the apartment that she shared with her brothers, so she moved in with her mother. Sicara also stated that she had nightmares about the events until her brothers were released from jail, and that she still occasionally suffers from nightmares. Although she also testified that her daughter, Ciara, suffered from nightmares, the jury was instructed that Ciara is not a plaintiff and thus was not entitled to damages. Lastly, Sicara testified generally about how the events of September 14, 2004 changed her, how "horrible" it felt to be "judged off where we lived and the color of our skin," and how she lost her faith in police. Id. at 38, ¶¶ 4-20.

### 1. *Monstrously Excessive and Rationally Related to the Evidence*

While the aforementioned emotional injuries are recoverable to a certain extent, Sicara's testimony also contained a plethora of testimony relating to perceived damages for which she cannot recover because no injury resulted, or the stated injuries are not related to the violation of her personal constitutional rights, but rather to those of her brothers. See Paul v. Davis, 424 U.S. 693, 700-701 (1976) ("Respondent . . . has pointed to no specific constitutional guarantee safeguarding the interest [s]he asserts has been invaded. Rather, [s]he apparently believes that the Fourteenth Amendment's Due Process Clause should ex proprio vigore extend to [her] a right to be free of injury wherever the State may be characterized as the tortfeasor. But such a reading would make of the Fourteenth Amendment a font of tort law to be superimposed upon whatever systems may already be administered by the States.").

First, and most significantly, Sicara is not entitled to compensatory damages for having witnessed the excessive force that was used against Seneca and Tari, for their time spent in jail, and for the time they and their attorneys spent challenging the charges against them. Nevertheless, Sicara testified passionately and in great detail about the beatings that she saw, the injuries to Seneca and Tari, the sadness of seeing her mother cry at their bond hearing, the worry and fear that she had for them while they were incarcerated and fighting the false charges against them, the change in her brothers' personalities since these events, and ultimately the break-up of their family unit since Seneca and Tari moved to Arizona. These same sentiments were reiterated by defense counsel during closing arguments; however, these do not constitute injuries compensable following the violation of Sicara's constitutional rights. Sibling loss of consortium is not recognized under § 1983. See Ortiz v. Burgos, 807 F.2d 6, 9 (1st Cir. 1986) (finding no constitutional right to the companionship of adult relatives); see also Russ v. Watts, 414 F.3d 783, 791 (7th Cir. 2005) (overruling Bell v. City of Milwaukee, 746 F.2d 1205 (7th Cir. 1984), and finding that the plaintiff-parents had no constitutional right to recover for the loss of society and companionship of their adult son when that relationship was terminated as an incidental result of state action); Niehus v. Liberio, 973 F.2d 526, 534 (7th Cir. 1992) ("Deprivations of the lesser services comprehended in the portmanteau term 'consortium' are not deprivations of liberty within the restricted meaning that the term bears in the Constitution."). Furthermore, "like all persons who claim a deprivation of constitutional rights, [Sicara is] required to prove some violation of [her] personal rights." Coon v. Ledbetter, 780 F.2d 1158, 1160 (5th Cir. 1986). She has no standing to recover for the violation of her brothers' constitutional rights, irrespective of what she may be able to recover as a bystander under state tort law. Id. "Protecting familial relationships does not necessarily entail compensating relatives who suffer a

loss as a result of wrongful state conduct, especially when the loss is an indirect result of that conduct." Harpole v. Ark. Dep't of Human Servs., 820 F.2d 923, 928 (8th Cir. 1987).

Next, it is undisputed that Sicara never suffered any physical injuries. Although the City admits that the Defendant Officers used excessive force against Sicara, she stated that neither she nor her unborn child was hurt as a result of the collision. The incident was described as merely being "jerked" and "jarred," and that it left a "hole" in the driver's side door of her car. Sicara Tr. at 17, ¶ 7; 18, ¶¶ 2, 7. Furthermore, Tari and Sicara were still able to drive the vehicle back to their neighborhood and park following this incident at the red light. Sicara did not seek medical attention while in custody or at any time thereafter. Plaintiffs presented no evidence to show that Sicara was ever concerned about having been injured. Although she testified that she feared the possibility of having to give birth in jail, she never said that she was worried about the health of her unborn child or the status of her pregnancy. Indeed, Sicara affirmatively stated that her unborn child was not harmed. That Sicara was four months pregnant at the time of her false arrest, without evidence to support any injury or aggravation arising therefrom, is not compensable. There was simply no evidence of physical injury.

In addition, it is well established that "a plaintiff may receive only one full compensation for his or her injuries, and double recovery for the same injury is not allowed." Duran v. Town of Cicero, 653 F.3d 632, 639 (7th Cir. 2011) (internal quotation marks and citation omitted). Although defense counsel informed the jury that the City was liable for excessive force, false arrest, and racial discrimination of Sicara,[2] she can only recover for her emotional distress injuries once, regardless of the number of claims. With respect to racial discrimination, Sicara

---

[2] The jury instructions provided, "The Defendant, City of Chicago, admits the following[:] . . . Sicara Adams was falsely arrested by Chicago Police Officers. During the course of the events, force in excess of that allowed by the Constitution was used. These acts caused emotional distress to Sicara Adams." Jury Instructions, at 16 [Doc. No. 475].

11

never testified regarding any remarks made to her by the arresting officers or the officers at the two police station when she was detained.

Finally, while the fear and emotional pain Sicara felt by being in her old neighborhood where the September 14, 2004 incident occurred may be recoverable to a certain point, the choices that she made to deal with that fear do not constitute compensable injuries. For example, the City is not liable for Sicara's choice to live with her mother in a one-bedroom apartment and sleep on an air mattress with her four-year-old daughter, instead of remaining in her apartment and sleeping in a bed. In addition, Sicara is not entitled to compensation because Seneca and Tari—and indeed herself for about four months—decided to leave the family in Chicago and move to Arizona.

Although unrecoverable, the jury was inundated with the above-described facts during Plaintiffs' testimonies, as well as during the closing arguments. One of the issues regarding the impassioned closing arguments is Plaintiffs' counsel's tendency to use the plural to avoid naming the individual Plaintiffs. For example, counsel asserts, "You get home and they get beaten more . . . ." Tr. of Closing Arguments at 4, ¶ 11 (N.D. Ill. Feb. 20, 2014) (emphasis added). It is not disputed that Sicara was not beaten or even handcuffed. Counsel goes on to say that "they are sitting there and they have to see each other beaten, battered, broken." Id. at 4, ¶¶ 19-20 (emphasis added). Additionally, Plaintiffs' counsel argues that "they get moved from a jail to Cook County Jail." Id. at 5, ¶¶ 10-11. The record, however, is clear that Sicara never went to Cook County Jail, but rather was transferred from one police station to another. Sicara was never searched in the manner that counsel describes her Co-Plaintiffs being searched. Id. at 5, ¶¶ 14-17. Further, counsel argued that "after this happened to them [Plaintiffs], they had to move to Arizona." Id. at 9, ¶ 5. This is not the record. The record is that, two years after the

events of September 14, 2004, Sicara moved to Arizona, remained there for four months, and then returned to Chicago.

In addition, Plaintiffs' counsel's reference to inmates of the Cook County Jail as "those animals" and "being locked in a cage with an animal" is disturbing. Id. at 26, ¶¶ 23-24. During his rebuttal, Plaintiffs' counsel refers to the inmates as "animals" no less than six times, and uses the word "cages" no less than three times. See id. at 26-27. These comments suggest to the jury that the "animals" were attacking or were likely to attack the brothers in the Cook County Jail and that this supposition is somehow compensable in damages to Sicara—who herself was never in the Cook County Jail. The Court further notes that the Cook County Jail is a place that houses human beings who are awaiting trial, and not serving time for felony convictions. None of the Plaintiffs was moved to a prison in the Illinois Department of Corrections. These generalized and emotionally charged arguments cannot serve to support damages never sustained specifically by Sicara.

Based on the size of the verdict, as compared to the evidence of recoverable injury, the jury was clearly inflamed with passion and prejudice—caused by the evidence of perceived damages which are not recoverable under the law—when reaching its award. "[O]bviously the slighter the emotional distress, the lower the ceiling on a reasonable award of damages. . . ." Avitia v. Metro. Club, 49 F.3d 1219, 1229 (7th Cir. 1995). In light of the sparse and vague evidence submitted to support Sicara's emotional damages, composed almost entirely of her own conclusory statements, the $300,000 award is monstrously excessive and not rationally related to the evidence presented.

## *2. Comparable Awards in Similar Cases*

Additionally, the $300,000 award is not comparable to awards given in similar cases. By way of example, the City submitted several cases with substantially lower verdicts supported by more evidence of injury than was presented in the instant case. In Fox v. Hayes, the jury awarded the plaintiff $1.7 million in compensatory damages on the plaintiff's false arrest claim where he was detained for thirty-six hours while falsely accused of the murder and sexual assault of his young daughter following a coerced confession. 600 F.3d 819, 825 (7th Cir. 2010). The Seventh Circuit found that "because the jury awarded less than half that amount on [the plaintiff's] malicious prosecution claim, which covered the remaining 242 days of incarceration, the award is simply unsupported by the evidence . . . [and] the false arrest damage award cannot stand." Id. at 846. The Seventh Circuit ordered that the plaintiff's damages be reduced to $16,000 on his false arrest claim. Here, Sicara was in jail for almost twelve hours less than the plaintiff in Fox, and under significantly less serious circumstances as she was only facing a misdemeanor disorderly conduct charge. Yet Sicara was awarded $300,000, while the plaintiff in Fox had his false arrest award reduced to $16,000.

In Moore v. City of Chicago, the plaintiff was involved in a dispute with roofers working at an adjoining property. No. 02 C 5130, 2007 WL 3037121, at *1 (N.D. Ill. Oct. 15, 2007). She called the police multiple times in one afternoon and accused the workers of trespassing and damaging her property. Id. at *1-2. She also accused the police of failing to help her. Id. The plaintiff was ultimately arrested and detained for approximately twelve hours. Id. at *2. The plaintiff suffered minor injuries to her arm following the arrest, and she suffered a seizure during her detention because she did not have access to her medication. Id. at *3. The jury awarded the plaintiff $250,000, and the court denied the defendants' motion for a remittitur. Moore v. City of

Chi., No. 02 C 5130, 2008 WL 4542734, at *2 (N.D. Ill. Jul. 25, 2008). The court found that, although the award was "generous" in light of the brief detention and lack of significant injuries, the verdict was nevertheless justified because the plaintiff was "so fragile, mentally and physically," with a long history of depression, and with a "mental and physical history [that] caused her to be far more vulnerable than most persons." Id. While, in the instant case, Sicara was pregnant at the time of her false arrest, she conceded that she suffered no physical injuries and merely experienced minor discomforts associated with her pregnancy. Sicara did not present evidence showing herself as an emotionally fragile plaintiff. To the contrary, Sicara testified as to how: she returned to work immediately following the incident, she attended some college, she became a security officer, and she has raised her two daughters. Sicara's perseverance distinguishes her from the plaintiff in Moore. Absent evidence of aggravating vulnerabilities, Sicara is not entitled to such a "generous" amount as the jury found in Moore.

In Bohannon v. Pegelow, the court upheld a compensatory damages award of $10,000, which would amount to approximately $28,310 today, in a case where "the plaintiff spent sixteen hours in jail, spent months contesting a pandering charge, and suffered the stigma of being branded a pimp and the embarrassment of having to deny that he attempted to sell his girlfriend's sexual favors." 652 F.2d 729, 734 (7th Cir. 1981). Sicara's $300,000 award is more than ten times greater than that in Bohannon, without the added injury of having to contest charges.

In Walker v. City of Chicago, the Seventh Circuit found that it was reasonable for the jury to award the plaintiff $0 in compensatory damages following his false arrest and twelve hour detention because the plaintiff failed to prove any damages. 513 F. App'x 593 (7th Cir. 2013). The court stated that "'when the injured party's own testimony if the only proof of emotional distress, he must explain the circumstances of his injury in reasonable detail; he

cannot rely on mere conclusory statements.'" Id. at 595 (quoting Denius v. Dunlap, 330 F.3d 919, 929 (7th Cir. 2003)). Evidence at Walker's trial showed that he was joking and laughing with his friends during his detention, "which the jury could view as contradicting his assertion that he was 'very upset'. Such testimony would allow a reasonable jury to find . . . that Walker suffered no emotional distress from his arrest and detention, unlawful though it was." Id. Like the plaintiff in Walker, Sicara relied largely on conclusory statements to support her claims of emotional distress. In addition, she too had evidence presented to the jury which tended to contradict her claims of emotional distress. Sicara returned to work immediately following her release from jail. She did not seek medical attention for herself or her unborn child following the events. Sicara never sought counseling or other mental health treatment. Indeed, the evidence showed that now ten years after the incident, Sicara has successfully moved on and created a stable life for herself and her daughters. Although the jury here could have reasonably awarded some level of compensation based on the evidence of emotional distress, the evidence does not support an award of $300,000, particularly in light of the contradictory evidence.

Ignoring the City's proffered cases, Plaintiffs submit a collection of their own cases to support the verdict as given by the jury; however, only one of the cases from within this circuit is specifically argued as applicable to Sicara's recovery. In Mason v. City of Chicago, the jury awarded the plaintiff $625,000 on his claims of excessive force and malicious prosecution. 641 F. Supp. 2d 726, 727 (N.D. Ill. 2009). The plaintiff in Mason suffered from a fractured orbital bone, incurred $60,000 in medical bills, had eye complications, and suffered a decreased sense of smell and lingering neurological damage. Id. at 730-731. In addition to the physical injuries, the plaintiff, lay witnesses, and expert witnesses testified to his emotional injuries which included: (1) decreased performance at work, (2) a transformed personality, (3) impaired relationships with

family and friends, (4) decreased levels of physical activity, (5) irrational fear when he saw a people who resembled the defendant-officer, (6) diminished self-confidence, particularly in relation to the scar left by his injuries, and (7) fear of being seen with his girlfriend who was present during the incident. Id. at 731. In denying a motion for remittitur, the court stated that "either the physical or the emotional set of injuries would be sufficient to conclude the [$625,000] verdict was not irrational." Id. Plaintiffs here argue that "the $300,000 awarded to Sicara Adams for her serious emotional damages—just as significant as those endured by the *Mason* plaintiff—cannot be irrational." Pls.' Resp. in Opp'n to Def.'s Mot. for Remittitur 11-12. Plaintiffs' statement is a gross exaggeration of the evidence presented as to Sicara. First, Sicara provided the only testimony in support of her emotional damages, as opposed to the Mason plaintiff who presented both expert and lay witnesses in addition to his own testimony. Second, Sicara never testified as to specific emotional injuries beyond general words such as "fear," "sadness," and "horrible." She did not suffer with work, and in fact returned to her job immediately upon her release. She attended some college and took criminal justice courses. With respect to changes in her personality and relationships with her family, she said only that she was distrustful of police and became more careful and protective of her daughters. Although Sicara testified as to the changes in her brothers' personalities, and that it is hard having them live so far away, as discussed above, she cannot recover for the injuries to her brothers or the choices that they made following the events of September 14, 2004. In short, the evidence presented in support of Sicara's emotional injuries is not comparable to that presented in Mason. Thus, this case is easily distinguishable with respect to the amount of the verdict.

Because the Court finds that the $300,000 verdict for Sicara is monstrously excessive based upon the evidence presented at trial, and is an outlier amongst verdicts in similar cases, the

City's motion for a remittitur is granted. It is well established that "[j]udges and juries must not be casual with other people's money." Avitia, 49 F.3d at 1229. Although still a generous amount, the Court finds that only $125,000 of the jury's verdict can be reasonably supported by the evidence presented at trial. The verdict as to Sicara is therefore reduced to $125,000. Because the motion for remittitur is granted, the Court denies the City's motion in the alternative for a new trial on damages.

### III. CONCLUSION

For the foregoing reasons, the City's motion for a remittitur is granted as to Sicara. Sicara's damages are hereby remitted to $125,000. The motion as it pertains to Seneca and Tari remains under advisement.

IT IS SO ORDERED.

ENTER:

_____
CHARLES RONALD NORGLE, Judge
United States District Court

DATE: June 10, 2014