**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

SENECA ADAMS, et al.,               )
                                    )
              Plaintiffs,           )
                                    )   No. 06 CV 4856
       v.                           )
                                    )   Hon. Charles R. Norgle
CITY OF CHICAGO,                    )
                                    )
              Defendant.            )

## OPINION AND ORDER

Plaintiffs Seneca Adams ("Seneca"), Tari Adams ("Tari") and Sicara Adams ("Sicara") (collectively, "Plaintiffs") proceeded to a jury trial on the issue of compensatory damages against Defendant City of Chicago (the "City") for: (1) false arrest, in violation of the Fourth Amendment as to all Plaintiffs; (2) excessive force, in violation of the Fourth Amendment as to all Plaintiffs; (3) discrimination on the basis of race, in violation of the Equal Protection Clause of the Fourteenth Amendment as to all Plaintiffs; and (4) malicious prosecution, in violation of Illinois state law as to Seneca and Tari. The jury returned a verdict in the amount of $2,400,000 for Seneca; $1,000,000 for Tari; and $300,000 for Sicara. The Court remitted Sicara's award to $125,000. Before the Court is the City's motion for remittitur as it pertains to Seneca and Tari. For the following reasons, the motion is granted.

## I. BACKGROUND

### A. Facts

The jury heard the following version of the facts from the sibling-Plaintiffs who testified in this case. The City of Chicago did not call any occurrence witnesses. The jury heard no evidence of what preceded the stopping of Seneca. On September 14, 2004, Seneca and Sicara,

20-year-old twins, shared an apartment with their 18-year-old brother, Tari, and Sicara's 4-year-old daughter, Ciara, in a neighborhood where they had lived their entire lives. Sicara's boyfriend lived with them from time to time. Their mother lived a short distance away. At approximately 8:00 p.m. that night, Seneca was running or jogging through the apartment complex when he heard, "Get down on the ground," and "Monkey, get down on the ground. Fuckin' nigger, get down on the ground." Seneca turned around and saw that Chicago police officers had their pistols drawn on him.[1] He got down to his knees and lay down with his face on the ground. An officer kicked him in the face. Seneca was then handcuffed and told to put his face down on the hood of the squad car. When Seneca turned around intending to inform the officer that the hood was too hot to comply, he was punched in the face, with a closed fist. According to Seneca, the officer was wearing weighted gloves.

Many spectators were present, including Seneca's niece, Ciara. Seneca asked the officer if he was going to beat him up in front of his niece. The officer stated, "I don't give a fuck about you or your nigger niece," and hit him in the face again. Seneca was bleeding from his mouth and eyes. He was then put inside the police car where the officer punched him repeatedly in the face with a closed fist, grabbed his hair and banged his head against the window, and elbowed him in face. He was driven to a secluded area where the officer continued to punch him and bang his head against the window. Seneca was bleeding from his lips, mouth, eyes, eardrum, and nose. Officers called him a "fuckin' monkey" and a "fuckin' nigger."

The officers then drove him back to his apartment complex and an officer told him to keep his head down or he would be sprayed with mace. He was left alone, with his head down,

---

[1] The Defendant Officers were dismissed from this lawsuit before the case proceeded to trial on the issue of compensatory damages. The Defendant Officers include former and current Chicago police officers Margaret Hopkins, Timothy McKeon, Matthew Riley, John Dahlberg, Jennifer O'Shaugnessy, Keith Herrera, John Hurley, and unknown Chicago police officers, who were members of the now-disbanded Special Operations Section ("SOS") of the Chicago Police Department.

for some time. Seneca was bleeding, in pain, and uncontrollably crying. When the officers returned it was dark outside. The officers drove him to the back of the county jail at 26th Street and Sacramento. There, he saw "a lot of cop cars" and officers in a huddle. Seneca testified that he was scared and did not know what to expect, and that it felt like he had been hit hundreds of times. Seneca testified that the combination of racial slurs and beating was "crazy," "humiliating," and "savage." Eventually, Seneca was taken to Mercy Hospital where he received medical treatment, including 9 stitches. The medical personnel did not provide or prescribe any medication.

Tari and Sicara, who were inside the apartment at the time the incident began, heard the commotion outside and decided to go outside to see what was happening. Tari left through the back door. Sicara left through the front door. Once outside, they saw Seneca in a police car being beaten by a police officer. Shortly thereafter, the officers drove away from the scene with Seneca in custody. Tari and Sicara decided to find out what was happening with Seneca because it did not look like the officers were driving in the direction of the police station. Tari and Sicara first called their aunt and their mother to let them know what was happening. After locking the apartment and checking on Ciara, Sicara and Tari got into Sicara's car. Tari drove in the direction that the officers had gone in an attempt to find Seneca. Sicara sat in the passenger seat.

Tari drove towards 26th and Sacramento, where they came upon a line of police cars and saw officers huddled outside of their cars. Sicara testified that she saw Seneca in the back of a police car, crying with a swollen and bloody face. She then rolled down her window and yelled to the officers, asking them what they were doing with Seneca. In response, an officer walked to the driver's side of the car and tried to shift the gears of the car into park, but could not reach the gear. The officer then punched Tari in the face. Sicara testified that they feared for their lives

3

so Tari drove away and headed back towards their apartment building. Tari stopped for a red light while waiting to turn left. Tari testified that, while waiting at the red light, a police car "slammed into the driver's side of my door. Glass flew in my face and fiberglass from the door." Sicara testified that the collision left a hole in the door of her car. Immediately thereafter, Tari drove away towards their apartment complex. He got out of the car, through the passenger side door, and was tackled by police officers. He was handcuffed, punched in the back of the head, and placed in the back of a police car. Tari testified that he was scared and sat in the police car for "[c]lose to hours." Tari was then driven around and beaten by 3 officers. Tari said that "it was like three maniacs just, you know, doing whatever they wanted to with me." Tari was initially taken to St. Anthony's Hospital, but after a few minutes there, he was driven to Mercy Hospital to receive medical treatment. While en route to Mercy Hospital, he was punched again by 2 officers. Tari testified that he tucked his head between his legs to protect his face from being hit, and made wheezing sounds to get them to stop. He had swollen eyes and lips, scratches and scrapes all over his face, and pain everywhere.

Other officers transported Sicara to the police station, located at 23rd and Damen. Hours later, Seneca was brought into the room with Sicara. Sicara testified that his face looked unrecognizable—Seneca's face and lips were swollen, he had cuts and bruises. An hour or 2 later, Tari was brought into the room with Sicara. Sicara said that his face looked hurt and that he was wearing a hospital gown with some blood on it. Tari was processed and taken to a basement area where he was placed in a cell with Seneca. Tari testified that he was devastated and angered by seeing Seneca with worse damage to his face.

The next morning, Sicara was transported to a different police station, located at Harrison and Kedzie where she was placed in a cell. In total, Sicara spent slightly over 24 hours in the

4

room and in jail. She was never taken to the Cook County Jail. She was released on her own recognizance (no cash bond). Her case was immediately dismissed when she appeared in court on the issued summons. On the morning that Sicara was released from jail, she and her mother watched Seneca and Tari's bond hearing. Seneca and Tari appeared through a video monitor. Sicara testified that her brothers "looked so sad and abused." Sicara said that she felt helpless looking at her brothers, and she watched as her mother cried and collapsed to the floor. Seneca was charged with 4 counts of aggravated battery and unlawful use of a deadly weapon. Tari was charged with 4 counts of aggravated assault and 2 counts of aggravated battery. At a bench trial, a judge of the Circuit Court of Cook County found them guilty of misdemeanors.

Following the hearing, Seneca and Tari were transported to the Cook County Jail, where they were subjected to a routine strip search during the intake process. Seneca testified that he felt humiliated, and Tari testified that the experience was "very degrading." Seneca and Tari remained in custody at the Cook County Jail for 204, and 46 days, respectively. Tari testified that while he and Seneca were incarcerated, they were not themselves physically, mentally, or emotionally. Seneca said that although he did not experience any violence and had no problems while he was in custody in Cook County Jail, he was nevertheless scared and feared violence. Tari was released on bond on November 1, 2004, with a 7:00 a.m.-7:00 p.m. curfew. Tari said he felt depressed; his freedom was everything. Seneca was released on bond in April of 2005.

Represented by lawyers, Seneca and Tari attended more than 20 court dates. While he was incarcerated, Seneca testified that at each court appearance he felt hope that he was going to get out. Their criminal cases proceeded to a bench trial; and, Tari testified that he was scared and angry when police officers told lies about him and Seneca that could ruin their lives. On May 18, 2006, Seneca and Tari were both found guilty of a misdemeanor and sentenced to

probation and community service. Each had to report to a probation officer. Seneca testified that he still felt like he was in jail because he had to follow rules and regulations—"I really can't do things the way I wanted to do it." On December 19, 2006, the charges against Seneca and Tari were vacated and their records were expunged.

Tari testified that following these events, Seneca had changed: "He didn't look like his usual self, where he was – he was a happy person, a social person"; rather, he was "in a sad state." Sicara added that Seneca was angry and obsessed about what happened to him; he also obsessed about justice. Sicara further testified that Tari too had changed: "He's not as trusting. He's not as free-hearted as he used to be. . . . He only deals with his family." Sicara went on to explain how the events caused them to move away to another state. Tari, however, testified that he moved to Arizona in March of 2006 (before Seneca) because there were more job opportunities, he had friends there and his older brother lived there. Seneca said he moved to Arizona because there were better opportunities and he did not have to deal with the same anxieties he had in Chicago. Sicara also said that their family unit was broken when Seneca and Tari moved to Arizona. Sicara moved to Arizona briefly in February of 2006, 2 years after her arrest, but she returned to Chicago 4 months later.

Seneca is now 30 years old, and is employed as a battery technician, a position that requires him to handle heavy machinery. Tari is now 27 years old and is employed as a dock worker at FedEx freight. Following these events, Seneca saw a psychiatrist 1 time on the recommendation of his attorney, but has received no other medical attention or treatment in the 10 years since then. Tari has never sought follow-up medical attention, counseling, or psychiatric or psychological treatment in relation to these events.

## B. Procedural History

Plaintiffs initiated this action in the year 2006. Discovery was stayed for over 2 years while criminal proceedings and other investigations were conducted as to the defendant police officers. The stay was lifted on June 1, 2009 and discovery went forth. After years of discovery, the parties reached an agreement wherein the City agreed to admit liability and proceed to a trial on the issue of compensatory damages only, in exchange for the dismissal of their claims against the individual officers. Specifically, the City admitted to the following: (1) false arrest, in violation of the Fourth Amendment as to all Plaintiffs; (2) excessive force, in violation of the Fourth Amendment as to all Plaintiffs; (3) discrimination on the basis of race, in violation of the Equal Protection Clause of the Fourteenth Amendment as to all Plaintiffs; and (4) malicious prosecution, in violation of Illinois state law as to Seneca and Tari.

This case proceeded to a jury trial on compensatory damages against the City on February 18, 2014. The jury was instructed to consider the following types of compensatory damages, and no others: The physical, mental, and emotional pain and suffering that Plaintiffs have experienced and are reasonably certain to experience in the future. On February 20, 2014, the jury returned a verdict for Seneca in the amount of $2,400,000; for Tari in the amount of $1,000,000; and for Sicara in the amount of $300,000. The City timely filed the instant motion for a remittitur of the jury's verdict, which is fully briefed and before the Court. On June 10, 2014, the Court granted the motion as to Sicara, remitting her compensatory damages award from $300,000 to $125,000. Now, the Court addresses the motion as it pertains to Seneca and Tari.

## II. DISCUSSION

### A. Standard of Decision

Compensatory damages "are intended to redress the concrete loss that the plaintiff has suffered by reason of the defendant's wrongful conduct." Cooper Indus., Inc. v. Leatherman Tool Gp., Inc., 532 U.S. 424, 432 (2003) (citations omitted). "A jury's assessment of the extent of a plaintiff's injury is essentially a factual determination," id. (citation omitted), which must be accorded substantial deference, Ramsey v. Am. Air Filter Co., 772 F.2d 1303, 1313 (7th Cir. 1985) (citing Levka v. City of Chi., 748 F.2d 421, 424 (7th Cir.1984)). However, "the court must also ensure that the award is supported by competent evidence." Ramsey, 772 F.2d at 1313 (citations omitted).

A successful § 1983 plaintiff may not be awarded damages merely "to account for 'the abstract value of a constitutional right.'" Horina v. City of Granite City, 538 F.3d 624, 637 (7th Cir. 2008) (quoting City of Watseka v. Ill. Pub. Action Council, 796 F.2d 1547, 1559 (7th Cir. 1986)). A plaintiff must "prove that the denial of his constitutional rights resulted in an actual injury." Id. (citations omitted). "'Rights, constitutional and otherwise, do not exist in a vacuum. Their purpose is to protect persons from injuries to particular interests . . . .' Where no injury [is] present, no 'compensatory' damages [can] be awarded." Memphis Cmty. Sch. Dist. v. Stachura, 477 U.S. 299, 308 (1986) (quoting Carey v. Piphus, 435 U.S. 247, 254 (1978)). In other words, compensatory damages are not presumed but "must be proved in order to be recovered; a plaintiff who wants substantial damages can't just ask for them." Ustrak v. Fairman, 781 F.2d 573, 579 (7th Cir. 1986) (citations omitted); see also Walker v. City of Chi., 513 F. App'x 593, 596 (7th Cir. 2013) (non-precedential order).

"The fact that the 'monetary value of the particular injury is difficult to ascertain'—as is often the case when the injuries asserted are humiliation, distress, and other harms associated with the denial of a right—does not preclude an award of damages." Horina, 538 F.3d at 637 (quoting City of Watseka, 796 F.2d at 1558-1559) (additional citations omitted). "But the plaintiff must nevertheless show that he actually suffered those injuries . . . ." Id. (citations omitted). It is well established that "[j]udges and juries must not be casual with other people's money." Avitia v. Metro. Club, 49 F.3d 1219, 1229 (7th Cir. 1995).

"When the reasonableness of a jury's verdict is called into question" courts "consider whether (1) the award is monstrously excessive; (2) there is no rational connection between the award and the evidence, indicating that it is merely a product of the jury's fevered imaginings or personal vendettas; and (3) whether the award is roughly comparable to awards made in similar cases." G.G. v. Grindle, 665 F.3d 795, 798 (7th Cir. 2011) (citations omitted); see also Dresser Indus., Inc., Waukesha Engine Div. v. Gradall Co., 965 F.2d 1442, 1446 (7th Cir. 1992) ("In this circuit, we will alter jury awards only if they are monstrously excessive, born of passion and prejudice, or not rationally connected to the evidence." (internal quotation marks and citations omitted)). Because the "monstrously excessive" inquiry is "a rather vague standard for review" it is "folded into the rational inquiry analysis." G.G., 665 F.3d at 799 (internal quotation marks and citation omitted).

**B. Motion for Remittitur**

The City argues that the damages awarded to Seneca in the amount of $2,400,000 and to Tari in the amount of $1,000,000 are grossly excessive and unsupported by the evidence. According to the City, these awards must have been based on passion and sympathy as opposed to actual evidence of harm because the evidence showed that neither Seneca nor Tari suffered

9

economic damages (medical expenses, lost wages, and other pecuniary losses); the most severe injuries required 9 stitches on Seneca, and neither Seneca nor Tari ever sought or required follow up medical treatment; and both Seneca and Tari testified as to generalized fear and sadness without any long-term harms. In addition, the City argues that the awards are out of line with comparable cases where other plaintiffs received lesser awards for more extensive and better supported injuries. It is well established that "[a]wards in other cases provide a reference point that assists the court in assessing reasonableness; they do not establish a range beyond which awards are necessarily excessive." Farfaras v. Citizens Bank & Trust of Chi., 433 F.3d 558, 566-67 (7th Cir. 2006) (internal quotation marks and citation omitted).

### 1. Seneca's $2.4 Million Award

Seneca's compensable injuries include: the physical, mental, and emotional pain and suffering caused by the City's wrongful conduct, including the combination of racial slurs and soft tissue injuries inflicted by police officers, resulting in some permanent scarring on his eye, over his eye, under his eyes, and bumps on his lip; the loss of his freedom for 204 days (approximately 7 months); the restricted freedom while he was defending himself against false criminal charges, and his misdemeanor conviction and sentence thereafter; and the uncertainty and apprehension he endured regarding his fate and future. These injuries are profound and support a substantial verdict.

However, the evidence in this case does not warrant the jury's extraordinary award of $2,400,000. "Statements made during closing argument are, of course, not evidence." Denius v. Dunlap, 330 F.3d 919, 928-29 (7th Cir. 2003) (citing Rastafari v. Anderson, 278 F.3d 673, 690 (7th Cir. 2002)). But the jury was inundated with an impassioned closing argument by Plaintiffs' counsel—their view of the evidence—which was largely inflammatory, unsupported, and lacked

a rational connection to the evidence. For example, counsel referred to inmates of the Cook County Jail as murderers, rapists, and violent criminals. Human beings, convicted felons in Illinois serve their time in the Illinois Department of Corrections and not in the Cook County Jail. In his rebuttal argument, counsel referred to the human beings—who are awaiting trial at the Cook County Jail and not serving time for felony convictions—as "those animals" and asserted that Seneca was "locked in a cage with them," which is disturbing. Plaintiffs' counsel referred to inmates as "animals" no less than 6 times, and used the word "cages" no less than 3 times. These slurs and comments suggested to the jury that the "animals," murderers, rapists, and violent criminals were attacking or were likely to attack Seneca and Tari in the Cook County Jail. To the contrary, Seneca admitted that he did not experience any violence and had no problems while he was incarcerated at the Cook County Jail. Specifically, Seneca testified that on 1 occasion he was threatened by 1 of the factions of inmates, which he referred to as "groups," and was told to mind his own business; he did so and had no problems. Seneca also said that because he was not part of the "groups" he could not eat the way he wanted to, shower when he wanted to, or play games without being told that he could. This evidence, however, does not support the jury's excessive award, and shows that it was a product of the jury's fevered imaginings, brought on by a largely unsubstantiated closing argument.

Additionally, while Seneca can recover for the indignities, humiliation, and emotional distress that he personally experienced as a result of his false arrest and his experiences challenging the wrongful charges brought against him, he cannot recover for emotional damages based upon the fear that he felt on behalf of his brother Tari and the possible penalties that Tari was facing. See, e.g., Coon v. Ledbetter, 780 F.2d 1158, 1160 (5th Cir. 1986) (holding that constitutional claims are personal and do not accrue to a relative) (collecting cases); see also

11

Laskowski v. Spellings, 546 F.3d 822 (7th Cir. 2008) ("[A] plaintiff has standing to sue only for injuries to his own interests that can be remedied by a court order." (citing Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992)). Nevertheless, in Plaintiffs' closing argument, counsel argued extensively in the plural, avoiding the evidence of personal and individual injuries sustained by each of the sibling Plaintiffs. For example, counsel stated that "they are sitting there and they have to see each other beaten, battered, broken." Sicara suffered no physical injuries.

Furthermore, testimony regarding the break-up of their sibling-family unit since Seneca and Tari chose to move to Arizona does not support damages for the violation of Plaintiffs' constitutional rights. Sibling loss of consortium is not recognized under § 1983. Bell v. City of Milwaukee, 746 F.2d 1205, 1247 (7th Cir. 1984) (declining to extend constitutional protection to a victim's siblings to recover for loss of society and companionship, and remarking that to rule otherwise, "there could be no principled way of limiting such a holding to the immediate family or perhaps even to blood relationships"), overruled on other grounds by Russ v. Watts, 414 F.3d 783, 791 (7th Cir. 2005); see also Niehus v. Liberio, 973 F.2d 526, 534 (7th Cir. 1992) ("Deprivations of the lesser services comprehended in the portmanteau term 'consortium' are not deprivations of liberty within the restricted meaning that the term bears in the Constitution."); Ortiz v. Burgos, 807 F.2d 6, 9 (1st Cir. 1986) (finding no constitutional right to the companionship of adult relatives).

Next, the City argues that awards in other comparable cases demonstrate that Seneca's award is excessive. While the damages awarded in this case cannot be completely analogized with an identical case with a similar or dissimilar verdict, the Court reviews the arguably comparable cases, although none are dispositive.

Plaintiffs point to Ibaenez v. Velasco as a comparable case which upheld a $2,500,000 verdict in an excessive force case. No. 96 C 5990, 2002 WL 731778, at *1, 12 (N.D. Ill. Apr. 25, 2002). There, the plaintiff suffered from bruising, scratches, neck strain, gynecological problems, fatigue, recurrent major depression, suicidal thoughts, panic attacks, recurrent bulimia, and post-traumatic stress disorder. Id. at *10. The similarity of Ibaenez to this case ends with the minor soft tissue injuries sustained—Seneca did not suffer from any reproductive or serious, long-lasting medical, psychological, or psychiatric issues. To the contrary, Seneca testified that he saw a psychiatrist 1 time on the recommendation of his attorney, and received no other treatment or counseling in the 10 years since the incident.

The City cites more instructive cases with significantly lower compensatory awards where plaintiffs sustained injuries due to police brutality. For example, in Niehus, the Seventh Circuit upheld a $336,320.59 compensatory damages award, which would amount to approximately $570,800.06 today, where the plaintiff was arrested on suspicion of drunk driving, and following an argument with the police in Berkeley, Illinois, he was kicked in the face 5 to 15 times, resulting in a broken cheekbone and brain damage. 973 F.2d at 527. Two police officers beat him in the Berkeley police station while 1 of his arms was handcuffed to a chair. Id. Expert testimony established that the fractured cheekbone caused significant disabling mental and emotional injury; and, as a result of his mental and psychological impairments, he had not been able to retain his family—the damage to his brain severely impaired his ability to maintain personal relationships. Id. at 528. Medical experts also presented evidence of permanent injury: "he suffered from depression, continual pain in his head and neck, and other physical and psychological symptoms that cumulatively had made his life a misery." Id.

In Garcia v. City of Chi., the court remitted a $1 million compensatory damages award to $250,000 where the plaintiff suffered a "brutal" attack resulting in a broken nose and a fractured eye orbital, both of which healed on their own and did not cause any permanent harm, aside from a slightly crooked nose. No. 01 C 8945, 2003 WL 22175622, at *3-4, 7 (N.D. Ill. Sept. 19, 2003). In Montano v. Atilano, the court denied a motion seeking remittitur of a $100,000 compensatory award where the plaintiff was struck with a flashlight, choked (nearly losing consciousness), had his hair pulled, and was repeatedly punched and kicked while in custody. No. 97 C 8035, 2011 WL 4540737, at *2, 5 (N.D. Ill. Sept. 29, 2011). As a result of his injuries, the plaintiff received pain killers and a cane, went to a physical therapist for 1 year and received other medical treatment for pain in his back and testicles; he could not return to his job, or have intimate relations with his wife. Id. at *2. Additionally, he had disorderly conduct charges pending against him for almost a year. Id. In Moreno v. Kelley, the court upheld a $100,000 compensatory award where the plaintiff was beaten with nightsticks which resulted in a 5-day hospital stay; the plaintiff suffered from a fractured nose and had permanent scarring from the attack. No. 00 C 0010, 2002 WL 58587, at *7 (N.D. Ill. Jan. 15, 2002). He also had a $900 loss of employment compensation. Id. Recently, in Degorski v. Wilson, a jury awarded $225,000 in compensatory damages where the plaintiff was punched repeatedly, knocking him temporarily unconscious, and causing him to suffer the loss of a tooth, and at least 6 separate fractures to his face that required surgery and the insertion of a metal plate into his cheek bone. No. 04 C 3367, 2014 WL 3511220, at *1-2 (N.D. Ill. July 16, 2014). There was evidence that immediately prior to the attack, the officer put on leather "shake down" gloves. Id. at *2.

Here, Seneca was subjected to a brutal physical attack, as well as verbal abuse based on his race—an aggravating factor. He suffered from bruising and cuts which required 9 stitches,

14

resulting in some permanent scarring on his face. However, Seneca never sought or required any follow up medical treatment. Moreover, Seneca had no medical expenses, lost wages, or other pecuniary losses.

Beyond the damages Seneca sustained for these minor soft tissue injuries, Plaintiffs cite several additional cases in support of Seneca's $2,400,000 award. See Fegan v. Reid, No. 06 C 6767, 2010 WL 3324889, at *1 (N.D. Ill. Aug. 19, 2010) (denying motion for new trial and noting that the jury awarded $1,553,000 in compensatory damages for unlawful seizure, excessive force, and intentional infliction of emotional distress); Finwall v. Chi., No. 04 C 4663 (N.D. Ill. Oct. 23, 2007) (entering judgment on jury verdict in the amount of $2,025,000 for false arrest, unlawful detention, and due process violation); Helmy v. City of Jersey City, 836 A.2d 802, 804 (N.J. App. Ct. 2003), and op. after remand aff'd by No. L-3454-99, 2005 WL 3691498, at *1 (N.J. App. Ct. Jan. 23, 2006) (upholding $500,000 compensatory damages award in a malicious prosecution case where the plaintiff was beaten and kicked before other officers, locked in a closet, taunted about his ethnicity, searched, forced to remove his clothing while handcuffed to a bench, ridiculed, denied medical attention, incarcerated for 3 days before making bail, and suffered stress from the incarceration and strip searches, interruption of his college studies, and psychological distress); Vitale v. Hagan, 132 A.D.2d 468, 468, 472 (N.Y. App. Ct. 1987) (upholding $750,000 jury award for a plaintiff who was never incarcerated in an action for assault, battery, false arrest, and malicious prosecution, but included a dissent characterizing the award as "shockingly excessive" and advocating for a reduction to $25,000). Plaintiffs' cited cases, however, provide sparse discussion as to the facts of each case and the evidence presented during trial; and, therefore offer little value as comparators. To the extent that there is any

meaningful factual development, there are distinguishing factors that are unhelpful in assessing the reasonableness of the jury's award in this case.

The Court finds the following cases more useful, although none are pointedly analogous. In Sykes v. Anderson, 2 plaintiffs received $1,020,000 and $1,063,000 in compensatory damages on their malicious prosecution and due process claims. Nos. 05071199, 05-73725, 2010 WL 5292287, at *1 (E.D. Mich. Dec. 20, 2010), aff'd, 419 F. App'x 615 (6th Cir. 2011) (non-precedential order). The plaintiffs were incarcerated for 43 days and 58 days, respectively, as a result of their wrongful convictions. Id. at *3-4. The plaintiffs presented evidence of economic damages in the amounts of $918,520 and $495,860, respectively. Id. at *2-3. The court determined that any portion of the compensatory damages the jury awarded based on non-economic damages was justified by the evidence presented at trial. Id. at *3. Thus, as to the second plaintiff, $567,140 was supported by non-economic damages. The plaintiff spent 58 days in jail, and was strip searched. Id. at *4. She testified that she felt "degraded," "terrified and fearful," and told the jurors how she lost weight in jail. Id. She also presented evidence, through her pastor, that while in jail she would cry, and felt despondent and helpless, and that following these events she was not the same person. Id. In addition to her testimony, she presented a medical expert who testified that she suffered from a major depression disorder and post-traumatic stress disorder, and that the incident had irreparably damaged her state of mind, work habits, and her job prospects. Id. at *5. Indeed, the plaintiff presented testimony that she was unable to find work for the 4 years between her arrest and trial. Id. at *2.

Seneca testified as to the same general feelings of fear and degradation. His sister, Sicara, testified that he was not the same person following these events. Further, he was in jail for 204 days, approximately 3.5 times longer than the Sykes plaintiff. However, he did not

16

present expert medical testimony as to his mental and emotional state during and after the incidents that led to his claims against the City.

With respect to the loss of freedom resulting from wrongful detention, the Seventh Circuit has upheld annualized damages of approximately $1,000,000 per year. See Newsome v. McCabe, 319 F.3d 301, 302-03, 307 (7th Cir. 2003) (upholding $15,000,000 damages award following a wrongful conviction and incarceration on murder charges where 15 years had passed between his conviction and his pardon on the ground of innocence). The Court notes that this is neither an automatic base award, nor a ceiling; indeed, in the appropriate case, a higher annualized award may be appropriate. For example, in Dominguez v. Hendley, the Seventh Circuit affirmed a $9,063,000 jury award where the plaintiff was wrongfully arrested at age 15 on charges home invasion and sexual assault, and spent 4 years incarcerated before being paroled. 545 F.3d 585, 587 (7th Cir. 2008). Plaintiffs argue that this amounts to approximately $2,000,000 for each year spent in jail. However, the award compensated the plaintiff for more than just the loss of his freedom, and general testimony of emotional damages. Throughout the process and the period following his release, the plaintiff maintained his innocence and continued to challenge his conviction until it was vacated (13 years following arrest) and he was pardoned by the Governor (16 years following arrest). Id. Prior to his exoneration, the plaintiff was subjected to deportation proceedings based on his conviction and was subsequently prosecuted and convicted for failure to timely register as a sex offender. Amended Joint Final Pre-Trial Order ¶¶ 19-20, Dominguez v. Hendley (N.D. Ill. Sept. 28, 2006) (Doc. No. 107, Ex. B). Moreover, the plaintiff presented several expert witnesses who concluded that he suffered from major depression and post-traumatic stress disorder. See Renewed Motion in Limine Regarding Damages ¶ 8, Dominguez v. Hendley (N.D. Ill. Sept. 12, 2006) (Doc. No. 78-2).

Finally, both parties rely on <u>Mason v. City of Chi.</u>, 641 F. Supp. 2d 726 (N.D. Ill. 2009), to support their respective positions. There, the court upheld a jury award of $625,000 on the plaintiff's claims for excessive force and malicious prosecution. <u>Id.</u> at 727. The plaintiff suffered a fractured orbital bone, eye complications related to the fracture, other facial problems, including a decreased sense of smell, lingering neurological damage, financial damages of over $60,000 in medical bills, and a wide range of emotional damage, including seriously impaired relationships with his friends and family, decreased physical activity, irrational fear of being in public or being seen with his girlfriend, and loss of self-confidence. <u>Id.</u> at 730-31. The court concluded that either the physical or the emotional injuries supported the jury's verdict. <u>Id.</u> at 731. The physical injuries sustained by the plaintiff in <u>Mason</u> are simply not comparable to those sustained by Seneca. The emotional injuries, however, provide a rough comparison to this case. Like the plaintiff in <u>Mason,</u> Seneca suffered from a changed personality—his happy demeanor changed to one of sadness, anger, and obsession with the events and justice. However, Seneca did not present evidence of changed personal and work habits, a decrease in self-confidence, fear of being in public, or impaired personal relationships. Rather, Seneca has a successful career as a battery technician, a position that requires him to handle heavy machinery.

In sum, the evidence presented in support of Seneca's non-economic injuries makes it an outlier among roughly comparable cases, and does not support the monstrously excessive $2,400,000 compensatory damages award. Accordingly, the Court remits the award to $1,170,000.

### 2. *Tari's $1 Million Award*

Tari's award compensated him for the physical, mental, and emotional pain and suffering he endured as a result of police misconduct, including soft tissue injuries resulting in swollen

eyes and lips, scratches and scrapes all over his face, and a bruised eye; the loss of his freedom for 46 days (approximately 1.5 months); the restricted freedom while he was defending himself against false criminal charges, and his misdemeanor conviction and sentence thereafter; and the uncertainty and apprehension he endured regarding his fate and future. However, for the same reasons discussed above, the evidence presented to support Tari's non-economic damages does not warrant the monstrously excessive jury award of $1,000,000.

Tari's physical injuries were less severe than Seneca's—he suffered no permanent harm from the brutal beating that he endured. Tari also testified that he never heard any police officer use any racial epithets or any racial statements. Moreover, he spent significantly less time in jail than Seneca, 46 days, compared to 204 days for Seneca. Tari testified that he experienced no problems while he was incarcerated at the Cook County Jail. Tari said that he passed the time by going to the lunchroom, the recreational area to play chess with the inmates in that unit or to watch television; that he would go to a facility where he could work out; that he would go out into the yard and walk the track; and that sometimes he would stay in his room and sleep or do pushups to keep his mind off of his situation. There is no evidence, as his counsel suggested in closing argument, that he was "locked in a cage" with "animals," murderers, rapists, and violent criminals.

Additionally, there was no evidence of medical expenses, lost wages, or other economic damages suffered as a result of the City's wrongful conduct. Tari had no long-term physical injuries. He never sought any follow-up medical treatment, psychiatric assistance, or other counseling following these incidents. There was no expert testimony presented at trial of Tari's physical injuries or of the extent of his emotional injuries. While Sicara testified that Tari's personality changed insofar as he is not as trusting or "free-hearted," there was no evidence of

changed personal and work habits, a decrease in self-confidence, fear of being in public, or impaired personal relationships. To the contrary, Tari testified that he loves his job as a dock worker at FedEx freight and is able to provide for his family—his daughter, son, and girlfriend. Tari further testified that he is the only dock worker that pulls or hostels trailers because he is a dependable person. "[O]bviously the slighter the emotional distress, the lower the ceiling on a reasonable award of damages. . . ." Avitia, 49 F.3d at 1229.

Although Sicara testified that these events caused them to move away to another state and counsel so argued that "after this happened to them [Plaintiffs], they had to move to Arizona," this is not the record. Tari said that he moved to Arizona because there were more job opportunities there, and he had friends there, including his older brother. In any event, Tari's decision to move to another state, Arizona, is a remote and unforeseeable consequence of the officers' wrongful conduct. Moreover, Tari cannot recover emotional damages for the sadness, anger or devastation he felt by seeing his brother in custody with worse damage to his face.

Finally, as discussed above, the Court has reviewed the cases cited by the parties and the compensatory damages awards in each case, and finds that Tari's $1,000,000 award is shockingly excessive and amounts to the jury improperly awarding punitive damages against the City. Because the $1,000,000 award is monstrously excessive and not rationally related to the evidence presented, the Court reduces the amount to $350,000.

## III. CONCLUSION

For the foregoing reasons, the City's motion for a remittitur is granted as to Seneca and Tari. Seneca's compensatory damages are hereby remitted to $1,170,000. Tari's compensatory damages are hereby remitted to $350,000.

IT IS SO ORDERED.

ENTER:

CHARLES RONALD NORGLE, Judge
United States District Court

DATE: August 1, 2014